**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| REBECCA STEED, | ) | |
| | ) | CASE NO.  4:15-cv-01269 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 10).

The issue before the undersigned is whether the final decision of the Acting Commissioner of

Social Security ("Commissioner") denying Plaintiff Rebecca Steed's ("Plaintiff" or "Steed")

application for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 416(I), 423, 1381 *et seq*., is supported by substantial evidence and,

therefore, conclusive.

For the reasons set forth below, this Court AFFIRMS the final decision of the

Commissioner.

# I.  Procedural History

Plaintiff filed applications for POD, DIB, and SSI in November of 2011.  (Tr. 249-252). Plaintiff alleged she became disabled on March 31, 2010.  (Tr. 46, 251).  The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration.  (Tr. 46).

At Plaintiff's request, an administrative law judge ("ALJ") convened an administrative hearing on December 3, 2013 to evaluate her application.  (Tr. 46-59.)  Plaintiff, represented by counsel, appeared and testified before the ALJ.  (*Id*).  A vocational expert ("VE") also testified. (*Id*).

On December 23, 2013, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled.  (Tr. 46-59).  After applying the five step sequential analysis,[1] the ALJ determined

---

[1]  The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(I).  Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  *Id*. § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  *Id*. § 404.1520(a)(4)(iii).  Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  *Id*. § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  *Id*. § 404.1520(a)(4)(v).

> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

2

Plaintiff retained the ability to perform work existing in significant numbers, and that she was not under disability at any time through date of the decision.  (Tr. 58-59).  (*Id*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council.  (Tr. 42).  The Appeals Council denied the request for review, making the ALJ's determination the final decision of the Commissioner.  (Tr. 1-4).  Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 1383(c)(3).

## II. Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in April of 1972 and was 38 years old on the alleged onset date, making her a "younger person" for Social Security purposes.  (Tr. 57, 249); 20 C.F.R. §§ 404.1563(c) and 416.963(c).  Plaintiff has past relevant work as bookkeeper.  (Tr. 57).  Plaintiff has at least a high school education.  (Tr. 57).

### B. Medical Evidence[2]

On April 8, 2011, Jean Dib, M.D., diagnosed generalized anxiety disorder and prescribed Xanax with no refills.  (Tr. 415).

On April 2, 2012, Steed was examined by psychologist James M. Lyall, Ph.D., at the request of the State Agency.  (Tr. 569-73).  Dr. Lyall noted that Steed's chief complaint was an inability to work due to pain associated with her diabetes.  (Tr. 569).  Steed indicated that she

---

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

[2]  Both parties acknowledge that the only dispute in this matter concerns the ALJ's treatment of Steed's mental health impairments, and, therefore, they confine their discussion of the medical evidence to mental health treatment and evaluations.  (Doc. 11 at p. 3; Doc. 14 at p. 2).  Thus, the Court intentionally omits any discussion of Steed's physical impairments.

tried to see a mental health professional in 2010, and at the first session it was recommended that she go to the hospital; she did not return.  (Tr. 570).  She also indicated that she went to the emergency room (ER) two months prior, because she was thinking of suicide.  (*Id*.)  She refused to be hospitalized, and so was given the phone number of the local mental health center and encouraged to contact them.[3]  (*Id*.)  Steed reported she spends most days in bed.  (*Id*.)  Dr. Lyall noted Steed was tearful during the examination, stating she had been depressed for at least four years.  (Tr. 571).  She was dressed casually and her hair was uncombed.  (*Id*.)  She further reported suicidal thoughts over the years but no current plan or intention to commit suicide.  (*Id*.)  Steed was well oriented to time, date, place and situation; able to remember three of three objects immediately, two of three objects after five minutes; and, able to repeat five numbers forward and four numbers backward.  (*Id*.)  Dr. Lyall noted that Steed "may have poor judgment at times" and estimated her intelligence was within the average to low average range.  (*Id*.)  Dr. Lyall diagnosed depressive disorder, not otherwise specified, as well as physical psychosocial stressors.  (Tr. 571).  Dr. Lyall assessed a symptom Global Assessment of Functioning (GAF) score of 50, a functional GAF score of 65, and an overall GAF score of 50.[4]  (Tr. 572).  Dr. Lyall

---

[3]  The Commissioner asserts that these aforementioned treatment records are not in the record, and Steed does not dispute this contention in her reply.

[4]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  DSM-IV at 34.  Conversely, a GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  DSM-IV at 34.  It bears noting that an update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed.,

observed that Steed's symptoms may improve if she received mental health care.  (*Id.*)  With respect to functional limitations, Dr. Lyall opined that Steed's mental and physical problems may cause some problems with focus and attention, thereby impacting her ability to understand, remember, and carry out instructions, as well as maintaining attention, concentration, and persistence and pace.  (Tr. 572).  With respect to Steed's ability to respond appropriately to supervision and to coworkers in a work setting, Dr. Lyall merely noted that she had gotten along well with others over the years, had a friend with whom she maintained regular contact, but reported avoiding others due to her depression.  (Tr. 572-573).  Finally, Dr. Lyall observed that Steed "would have difficulty dealing with work pressure at the present time because of her depression and loss of energy, partially associated with her health problems and her depression. She does not appear to have much affective energy at the present time."  (Tr. 573).

On April 5, 2012, Mel Zwissler, Ph.D., reviewed Plaintiff's mental health records, assigned great weight to Dr. Lyall's report, and adopted the mental RFC of the previous ALJ, which limited Steed to simple, repetitive tasks, little stress or pressure, no interactions with the public, and only occasional interactions with coworkers.  (Tr. 152-155).  On July 25, 2012, Cynthia Waggoner, Psy.D., affirmed the prior mental RFC assessment.  (Tr. 172-173).

On May 22, 2012, Plaintiff began treatment for her mental impairments.  (Tr. 576-586). She reported being "very depressed," and that her depression had worsened in the last year.  (Tr. 576).  She also reported difficulties sleeping.  (*Id.*)  On mental status examination, she was tearful and sad; dress and grooming were appropriate; her mood depressed; her general attitude self-destructive; her affect restricted; she was oriented to time, place and person; she had average

---

2013).

intellect; her remote memory was poor; her thought processes circumstantial; fair insight and judgement; frequent suicidal ideation; normal abstract thinking; and no delusions or hallucinations.  (Tr. 583).  She was diagnosed with major depressive disorder, recurrent and severe, without psychotic features, and assessed a GAF score of 47.  (Tr. 584).  The recommended treatment was counseling.  (*Id*.)

On November 29, 2012, Steed underwent an intake assessment at Solutions Counseling Center performed by Loretta Phillips, PCC.  (Tr. 698-709.)  Ms. Phillips noted: "Client is anxious and depressive symptoms. Client is in severe pain. Case management is highly needed." (Tr. 699).  Steed reported a high intensity of anxiety and stress.  (*Id*.)  Ms. Phillips made a referral to a nurse practitioner and planned to refer Steed for pain management. (Tr. 701.)  Steed identified a suicidal plan "[t]o be hit by a train so my son doesn't know."  (Tr. 705.)  On mental status examination, Steed exhibited normal dress and hygiene; she was oriented to time, person, place, and situation; her short and long-term memory were within normal limits; her concentration was poor; her mood was depressed and anxious; she had fair insight and judgment; thought process revealed a flight of ideas; and slowed motor behavior.  (Tr. 707-708.)  Ms. Phillips diagnosed depressive disorder not otherwise specified and anxiety disorder not otherwise specified, and assigned a current GAF score of 53, with a highest GAF score of 58-62.  (Tr. 708, 785.)  For treatment, she planned one to two visits per week, as needed.  (Tr. 709.)

On February 1, 2013, Steed was seen by Ms. Phillips.  (Tr. 774). Steed was anxious and distraught.  (*Id*.)  Steed reported arguing with her husband and being unable to perform daily functions.  (*Id*.)

On February 5, 2013, Steed was again seen by Ms. Phillips.  (Tr. 773).  Steed was "tearful

and very anxious with depressive symptoms." (*Id*.) Steed indicated that she wanted aid for her SSI. (*Id*.) Steed stated that she was in continuous pain, which prevented her from working. (Tr. 773).

On April 22, 2013, Steed was seen by Linda Ellis, LISW-S (Licensed Independent Social Worker - Supervisor) at Solutions Counseling. (Tr. 772.) She reported an inability to leave her home due to low motivation. (*Id*.) Ms. Ellis noted Steed was tearful and discouraged. (*Id*.)

On May 15, 2013, Steed was seen by psychiatric mental health nurse practitioner Natalie Kozicky, PMHNP-BC. (Tr. 759-763). Steed reported being anxious and depressed for the past two years. (Tr. 763). Steed denied suicidal or homicidal ideation; she had thought about suicide but denied intent. (Tr. 760). No abnormalities were reported in the following areas: behavior, cognition, thought process or thought content, or perception. (Tr. 760-61). Steed's intelligence was noted as average. (Tr. 761). Ms. Kozicky diagnosed major depressive disorder, recurrent, moderate, with anxiety; anxiety disorder not otherwise specified; panic disorder without agoraphobia; posttraumatic stress disorder, chronic; and ruled out personality disorder not otherwise specified, with dependent and borderline traits. (*Id*.) Steed was assigned a current GAF score of 55, and her highest GAF in the past year was 62. (*Id*.) Steed's prescription for Seroquel XR was continued, and new prescriptions were added for Zoloft and Ativan. (Tr. 762).

On June 4, 2013, Steed was seen by social worker, Ms. Ellis, who noted that Steed's depression continued, though there were no reports of suicidal ideation. (Tr. 771). Steed reported difficulty leaving home, but reported medication compliance and was able to care for herself and her son. (*Id*.) Her level of functioning was unchanged and her risk or lethality was considered minimal. (*Id*.)

7

On June 25, 2013, Ms. Ellis noted that Steed's level of functioning was slightly worse but her risk of lethality remained minimal.  (Tr. 770).  Steed was observed as tearful with continued symptoms of depression.  (*Id.*).

On October 1, 2013, Steed was seen by Gamal El-Mobasher, M.D.  (Tr. 742.)  Steed stated that her husband left her because she was unable to do things around the house.  (*Id.*)  Dr. El-Mobasher diagnosed generalized anxiety disorder, a number of physical ailments, and prescribed Ativan.  (*Id.*)

On October 3, 2013, Steed was seen by Ms. Ellis, and was tearful and upset.  (Tr. 769).  Her level of functioning was unchanged and she had no identified risk of lethality.  (*Id.*)

On October 15, 2013, Ms. Ellis noted Steed's level of functioning was unchanged.  (Tr. 768).

On October 22, 2013, Ms. Ellis noted that Steed felt responsible for her husband moving out, causing an increase in her depression.  (Tr. 767).  Steed's level of functioning was moderately worse but her risk of lethality remained minimal.  (*Id.*)

On November 5, 2013, Ms. Ellis found Steed's level of functioning was slightly better and there was minimal risk of lethality.  (Tr. 766).  Steed reported retaining a divorce lawyer. (*Id.*)  By November 19, 2013, Steed reported that her symptoms had improved, though she continued to report difficulty with concentration and focus.  (Tr. 765).  Ms. Ellis noted that Steed was adjusting well to marital separation.  (*Id.*)  Her level of functioning was slightly better, and there was no identified risk of lethality.  (*Id.*)

On November 21, 2013, two days after her counseling session, Ms. Ellis completed a form assessing Steed's ability to perform work-related mental activities.  (Tr. 754).  She opined

that Steed had extreme limitations performing daily activities (such as attending meetings or socializing with friends/neighbors), performing activities within a schedule, maintaining attendance, and being punctual.  (*Id*.)  Ms. Ellis also assessed marked limitations in Steed's ability to relate to people; maintain concentration and attention for extended periods; sustain a routine without special supervision; respond to customary work pressures; respond to changes in the work setting; perform simple tasks; and perform complex, repetitive or varied tasks.  (Tr. 754-755).  Finally, Ms. Ellis assessed a moderate deterioration in Steed's personal habits; and moderate limitations in Steed's ability to understand, carry out and remember instructions and to behave in an emotionally stable manner.  (*Id*.)  Ms. Ellis concluded that Steed's medication caused fatigue, that Steed would be absent from work more than three times a month due to her impairments, and would likely deteriorate if she was under the stress of a job.  (Tr. 755).

**C.  Hearing Testimony**

At the December 3, 2013 hearing, Steed testified as follows:

- She is 5'2" tall and weighs 272 pounds.  (Tr. 75).

- She is separated from her husband and lives with her 17-year-old son.  (*Id*.)

- She rarely drives since her son obtained a driver's license, and avoids driving because it makes her nervous.  She only drives once or twice a month to doctors' appointments.  (Tr. 76, 80-81).

- She attended college for two years and studied accounting.  (Tr. 77).

- She resigned from her last job for health reasons.  (Tr. 78).

- She has not applied for any jobs since 2005, because, for at least the past two years, "it's a struggle for her to get up the next day."  (Tr. 80, 82).  Her struggle to get out of bed stems from both mental and physical impairments.  (Tr. 83).

- Since 2010, either her husband or, more recently, her son does the grocery

9

shopping.  (Tr. 81-82).

- She stays in bed most days, but tries to get out of bed after her son comes home from school.  (Tr. 84-85).

- A friend of hers has been coming to her house for years and helping with chores.  (Tr. 85-86).  Her mother also helps with chores.  (Tr. 86).

- She is unable to perform household chores due to pain in her back and feet.  (Tr. 86).  She wears flip-flops rather than shoes, as the latter are too painful on her feet.  (Tr. 86-87).

- A specialist told her she suffers from severe neuropathy.  (Tr. 88).

- She also experiences pain and numbness in her hands, resulting in her dropping objects and difficulty with buttons.  (Tr. 90-92).

- She has daily back pain that radiates to her hips.  (Tr. 93–94).

- She can stand for 30 minutes before needing to change positions or sit down.  She can walk for, at most, an hour.  She can sit for three hours without elevating her legs before the pain becomes intolerable.  (Tr. 94).

- She could not repetitively or continuously lift a gallon of milk or a 5-pound bag of sugar.  (Tr. 95).

At the hearing, Steed's case worker, Michelle Stahl, also testified:

- Her role in Steed's care includes referring Steed to various doctors, accumulating records, and on one occasion transferring her to the hospital for treatment.  (Tr. 97-98).

- She sees Steed weekly when she attends counseling sessions with Linda Ellis, but does not necessarily interact with her weekly.  (Tr. 98-99).

- She estimated Steed's anxiety is a 7 out of 10 on a daily basis.  (Tr. 100).  She described Steed as "[v]ery tearful.  Very upset. Problems breathing on occasion.  Cannot focus, becomes disoriented, fearful."  (Tr. 100).

- In response to a question from counsel, who acknowledged Ms. Stahl is "not an expert or anything," she opined Steed could not perform a simple job due to "[h]er lack of attention.  Her focus is very, very minimal.  Her anxiety increases from something that might be, we might judge as small, but it becomes extreme to her

10

rapidly."  (Tr. 101).

• She believes Steed's symptoms have worsened rather than improved.  (Tr. 103).

The VE classified Steed's past jobs as bookkeeper, Dictionary of Occupational Titles

("DOT") § 210.382-046, sedentary exertional level, skilled, with an SVP of 5; and office

manager, DOT § 219.362-010, light exertional level, semi-skilled, with an SVP of 4.  (Tr. 105).

The ALJ posed the following hypothetical question to the VE:

> Let's assume an individual who can do a range of light work, the ability to
> alternate positions about every hour as needed, but would be expected to remain
> on task.  Pushing and pulling will be limited to frequently, bilaterally both foot
> and hand controls, frequent handling and fingering bilaterally.... Occasional
> posturals, but no climbing of ropes, ladders, or scaffolds.  No exposure to
> unprotected heights or moving mechanical parts.  Occasional operation of a motor
> vehicle.  Avoid concentrated exposure to cold, frequent vibration.... Mental
> limitations are simple, routine, and repetitive tasks.  Low to average production
> rate pace.  Simple work-related decision-making.  Occasional contact with others,
> superficial with the public.  In a low stress environment with infrequent changes.
> Could such an individual perform that past light job?

(Tr. 105-106).

The VE testified that such an individual could not perform Steed's past work as an office

manager, but there would be other jobs available.  (Tr. 106).  The VE identified the following

light exertional jobs as examples: stock job, DOT § code is 209.587-034, unskilled with an SVP

of 2 (250,000 jobs nationally, 9,000 in Ohio); mail room clerk, DOT § 209.687-026, unskilled

with an SVP of 2 (105,000 jobs nationally, 900 in Ohio); office helper, DOT § 239.567-010,

unskilled with an SVP of 2 (80,000 jobs nationally, 1,300 in Ohio).  (Tr. 107).

The ALJ posed a second hypothetical question incorporating the same limitation as the

first but reducing the exertional level to sedentary.  (Tr. 107-108).  The VE responded that such

an individual could not perform Steed's past work as a bookkeeper.  (Tr. 108).  Nevertheless, the

11

VE identified several sedentary jobs that such an individual could perform: document preparer, DOT § 249.587-018, unskilled with an SVP of 2 (70,000 jobs nationally, 1,800 in Ohio); addresser, DOT § 209.587-010, unskilled with an SVP of 2 (3,900 jobs nationally, 270 in Ohio), at least 270 jobs; and tube operator, DOT § 230.687-014, unskilled (3,600 jobs nationally, 100 in Ohio).  (Tr. 108-110).  Steed's counsel posed a variation of the ALJ's hypothetical which, among other limitations, included only occasional handling.  (Tr. 112).  The VE testified that the three above-identified positions would all be eliminated, as they require frequent handling and reaching.  (*Id*.)

### III.  Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law in her December 23, 2013 decision:

1.  The claimant meets the insured status requirements of the Social Security Act (the "Act") through March 31, 2010.  This finding adheres to that of the previous decision.

2.  The claimant has not engaged in substantial gainful activity since March 31, 2010, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.). This finding departs from that of the previous decision, but only insofar as it reflects the alleged onset date for the present claim.

3.  The claimant has the following severe impairments: idiopathic thrombocytopenia, diabetes type II with neuropathy, depressive disorder-not otherwise specified and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).  This finding departs from that of the previous decision, in order to allow for the claimant's additional diagnoses of generalized anxiety disorder and diabetes mellitus with neuropathy.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  This finding

12

adheres to that of the previous decision.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant must be afforded the option to sit or stand once each hour, with the proviso that she remain "on task" while doing so; the claimant may frequently push and/or pull, including the operation of hand and foot controls, with the bilateral upper and lower extremities; the claimant may frequently handle and finger bilaterally; the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may frequently be exposed to vibration, must avoid concentrated exposure to extreme cold, may occasionally operate a motor vehicle, but must otherwise avoid all exposure to workplace hazards, including unprotected heights and moving mechanical parts; the claimant is limited to the performance of simple, routine, repetitive tasks, involving no more than simple decisionmaking, undertaken in a work setting that imposes no more than average production rate pace or quotas, which setting requires no more than superficial interaction with the public and no more than occasional interaction with co-workers and supervisors.  This finding departs from that of the previous decision, in order to accommodate limitations imposed by the impairments as evidenced in the record.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).  This finding adheres to that of the previous decision.

7. The claimant was born on April 2, 1972 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).  This finding departs from that of the previous decision, but only insofar as it reflects the attainment of greater chronological age.

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).  This finding adheres to that of the previous decision.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).  This finding adheres to that of the previous

decision.

10.    Considering the claimant's age, education, work experience, and residual
       functional capacity, there are jobs that exist in significant numbers in the
       national economy that the claimant can perform (20 CFR 404.1569,
       404.1569(a), 416.969, and 416.969(a)).  This finding adheres to that of
       the previous decision.

11.    The claimant has not been under a disability, as defined in the Social
       Security Act, from March 31, 2010, through the date of this decision (20
       CFR 404.1520(g) and 416.920(g)).  This finding departs from that of the
       previous decision, but only insofar as it reflects the alleged date of
       onset for the present claim.

(Tr. 46-59).

## IV.  Disability Standard

A claimant is entitled to receive a Period of Disability, Disability Insurance Benefits or

Supplemental Security Income benefits only when she establishes disability within the meaning

of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when

she cannot perform "substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  *See* 20 C.F.R. §§ 404.1505,

416.905(a).

## V.  Standard of Review

Judicial review of the Commissioner's benefits decision is limited to a determination of

whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are

supported by substantial evidence.  *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 405 (6th

Cir. 2009); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971).

"Substantial evidence" has been defined as more than a scintilla of evidence but less than a

14

preponderance of the evidence. *See Kennedy v. Astrue*, 247 Fed. App'x 761, 2007 WL 2669153, at *3 (6th Cir. 2007); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed. (*Id.*)

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *See Kennedy*, 247 Fed. App'x 761, 2007 WL 2669153, at *3; *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, the court may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. Analysis

Steed claims the ALJ erred by rejecting the opinions of her "treating mental-health counselor," her "mental-health case manager," and of a consultative psychologist, Dr. Lyall. (Doc. 11 at pp. 11-14).

First, Steed takes issue with the weight accorded to the hearing testimony of her case manager, Ms. Stahl, as well as the weight accorded to the mental health assessment completed by a social worker, Ms. Ellis, who regularly counseled her. (Doc. 11 at pp. 11-13). Steed, however, fails to correctly characterize the type of sources Ms. Stahl and Ms. Ellis constitute under the

regulations.

As a case manager and social worker respectively, neither Ms. Stahl nor Ms. Ellis constitute an "acceptable medical source" with the meaning of the regulations, but rather they only qualify as "other sources."  *Compare* 20 C.F.R. § 404.1513(a) with § 404.1513(d)(3).  In fact, among the several categories of "other sources" identified under 20 C.F.R. § 404.1513(d), it is questionable whether Ms. Stahl and Ms. Ellis would even qualify as "medical sources" who are not "acceptable medical sources," such as nurse practitioners, physician's assistants, therapists, *et cetera* under § 404.1513(d)(1).  Rather, they most likely fall under § 404.1513(d)(3), public and private social welfare agency personnel.[5]  *See, e.g,, Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016) (observing that a "licensed clinical social worker" is not an "acceptable medical source," and, therefore, rejecting the contention that a social worker's opinion was owed deferential weight); *accord Racz v. Comm'r of Soc. Sec.*, 2016 U.S. Dist. LEXIS 18390 (S.D. Ohio Feb. 16, 2016) (finding it was erroneous to categorize a social worker as a "treating source," as "licensed independent social workers are not 'acceptable medical sources'"); *see also Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109 (6th Cir. 2010) (finding the "ALJ did not err in failing to include any limitations noted by ... the case manager.... [as] social workers are not acceptable medical sources."); *accord Hayes v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 71723 (W.D. Mich. June 15, 2011) ("There is no 'treating social worker' rule.  Social workers are not 'acceptable medical sources.'  Their opinions are not treating-source

---

[5]  Admittedly, the distinction among these various categories of "other sources" does not appear to be significant, as Social Security Ruling ("SSR") 06-03p, quoted below, requires an ALJ to explain the weight ascribed to opinions from these "other sources" who have seen the claimant in their professional capacity.

opinions.") (internal citations omitted).  As such, Steed's attempts to characterize the opinion of either Ms. Stahl or Ms. Ellis as "treating source" opinions are unavailing.

Nevertheless, Social Security Ruling ("SSR") 06-03p, 2006 SSR LEXIS 5, explains how the Commissioner should address opinions from sources that are not "acceptable medical sources," but rather "other sources."  Among these "other sources" are therapists, nurse practitioners, social workers and school teachers. 2006 SSR LEXIS 5, at *4, [WL] at *1-2. While information from "other sources" cannot establish the existence of a medically determinable impairment, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function.  (*Id*.)

In relevant part, SSR 06-3p states:

Opinions from "non-medical sources" who have seen the individual in their professional capacity should be evaluated by using the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."  Not every factor for weighing opinion evidence will apply in every case.  The evaluation of an opinion from a "non-medical source" who has seen the individual in his or her professional capacity depends on the particular facts in each case.  Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

For opinions from sources such as teachers, counselors, **and social workers who are not medical sources**, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source.  For example, this could occur if the "non-medical source" has seen the individual

17

more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

* * *

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. **Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources,"** or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-3p, 2006 SSR LEXIS 5 at *15-16, 2006 WL 2329939, at *6 (emphasis added).  The ALJ

specifically addressed the opinions of Ms. Stahl and Ms. Ellis as follows:

Little weight was accorded the opinion of the claimant's treating source, Michelle Stull,[6] CPST that the claimant met listing 12.06.  Ms. Stull treated the claimant, yet the evidence, including essentially benign mental status examinations (B13F/4-6), (B28F/3-4), are indicative of a much higher level of function.

Little weight was accorded the opinion of the claimant's counselor, Linda Ellis, LISW, that the claimant exhibited multiple marked and extreme limitations across all of the psychological work-related capabilities.  Ms. Ellis has treated the claimant over the course of a year and was reporting within the bounds of her professional certifications, yet mental status examinations included in the record are indicative of a higher level of function (B13F/4-6), (B28F/3-4), and such limitations are not consistent with Ms. Ellis' own notes, which indicate that the claimant maintains her symptoms of depression and anxiety, but is adjusting well (B29F/2) and making slight improvement (B29F/2, 3).

(Tr. 56-57.)

Here, the ALJ not only clearly considered the opinions of Ms. Stahl and Ms. Ellis, but she

---

[6]  The hearing transcript refers to the witness as "Michelle Stahl," and the Court utilizes that spelling.  (Tr. 97).

plainly *explained* her reasons for ascribing them little weight.  While the ALJ's explanation

admittedly could have been more thorough, the *explanation* requirement, nevertheless, should

not be construed as rigorously as the treating physician rule, which applies only to "acceptable

medical sources." *Jefferson v. Colvin*, 2015 U.S. Dist. LEXIS 94716 (N.D. Ohio, Jul. 21, 2015)

(White, M.J.) ("[the] explanation requirement should not be confused with the standard required

for the weight ascribed to treating sources.") (citations omitted).

     The Court finds the ALJ complied with her duty to explain the weight accorded to Ms.

Stahl's opinions.  Further, to the extent Ms. Stahl was opining that Steed was unemployable, met

or equaled a listing, or was disabled, the ALJ was under no duty to give any special significance

to such opinions, which are not considered "medical opinions."  *See* 20 C.F.R. 404.1527(d)(1)-

(3).  Those determinations are reserved to the Commissioner.  (*Id.*) ("Although we consider

opinions from medical sources on issues such as whether your impairment(s) meets or equals ..

the Listing of Impairments ... the final responsibility for deciding these issues is reserved to the

Commissioner.")  As Ms. Stahl does not constitute a "medical source," it is doubtful whether her

opinion on an issue reserved to the Commissioner necessitates consideration.   Nonetheless, the

ALJ did consider it, and explained why she rejected it.

     With respect to Ms. Ellis, again the ALJ plainly considered her opinion but construed it

as being inconsistent with the records, including her own counseling notes.  Steed challenges the

alleged inconsistency, and contends slight improvement in her functioning was not a good

enough reason to discount Ms. Ellis's opinion.  Steed relies on *Boulis-Gasche*, wherein the Sixth

Circuit found that an ALJ improperly relied on a doctor's statement that claimant was "feeling

better" to conclude that the claimant's mental impairment had subsided, and did not constitute a

medically determinable impairment that met the twelve-month durational requirement. *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 Fed. App'x 488 (6th Cir. 2011).  The case is distinguishable, as here the ALJ found Steed's depressive disorder and generalized anxiety disorder constituted severe impairments, and the ALJ included significant mental-based limitations into the RFC based on those impairments.[7] (Tr. 49, 51).  It is further distinguishable in that *Boulis-Gasche* involved *medical* opinions, whereas here Ms. Ellis again only constitutes an "other source."  While Steed may disagree with the ALJ's explanation or her interpretation of the evidence of record, her disagreement with the ALJ's rationale does not provide a basis for remand.  Steed's argument essentially invites the Court to find that the explanation given by the ALJ for rejecting the opinions of these "other sources" are not sufficiently "good reasons" – much like the requirements of the treating physician rule.  Such an endeavor, however, would essentially transform the "explanation" requirement applicable to "other sources" into the functional equivalent of the more rigorous treating source rule.  Absent any express authority, the Court declines to judicially extend the scope of the treating source rule to "other sources" that do not constitute "acceptable medical sources" under the regulations.

Furthermore, reading the decision as a whole, the ALJ accorded "considerable weight" to the opinions of State Agency medical consultants Dr. Zwissler and Dr. Waggoneer, who do constitute acceptable medical sources.  (Tr. 56.)  Though these opinions pre-date the counseling sessions of Ms. Ellis, the Court cannot find that according greater weight to the opinions of acceptable medical sources than to the opinions of non-medical "other sources" is erroneous.

---

[7]  By contrast, the ALJ in *Boulis-Gasche* found that Plaintiff could perform a *full range* of medium work, strongly suggesting that he gave no consideration to limitations caused by Plaintiff's depression or panic disorder.  451 Fed. App'x 491 at n. 2.

Thus, the Court finds that the ALJ has not erred, as she adequately *explained* the weight she ascribed to the opinions of these "other sources."

Turning to the opinion of non-treating, psychological consultative examiner Dr. Lyall, the ALJ assigned "some weight" to his opinion, explaining as follows:

> Some weight was accorded the opinion of the consultative psychological examiner, James Lyall, Ph.D., that the claimant would have no limitations in understanding, remembering and carrying out instructions, would have no limitations, from an objective standpoint, but some difficulty, based on subjective report, with maintaining concentration, persistence and pace, that she would have no difficulty relating to others and that she would have difficulty withstanding the stressors of day-to-day work.  Dr. Lyall examined the claimant on a single occasion and was reporting within the bounds of his professional certifications and specialty; however, evidence from the previous decision, and evidence subsequent to his examination suggests additional limitations.

(Tr. 56).

First, it must be observed that the opinions of consultative examiners, such as Dr. Lyall, are *not* entitled to the same deference accorded to the opinions of treating physicians.  While an ALJ must consider all the medical evidence of record pursuant to 20 C.F.R. § 404.1527(b), more weight is generally given to the opinions of treating sources. *See* 20 C.F.R. § 404.1527(c)(2). With respect to the opinion of Dr. Lyall, Steed's argument is not altogether clear.  In this Court's view, the decision can only reasonably be construed as suggesting that Dr. Lyall's opinion was not afforded greater weight because "additional limitations" were warranted that went beyond Dr. Lyall's opinion.  (Tr. 56).  Though Steed contends the RFC was ultimately less restrictive, she does not meaningfully explain how she arrives at this conclusion.  (Doc. 11 at pp. 13-14).  The Commissioner argues, and this Court agrees, that Dr. Lyall's opinion does not provide for specific functional limitations.  (Doc. 14 at p. 15, Tr. 569-573).  Instead, Dr. Lyall made a series

of rather equivocal statements when asked to offer functionality assessments.  When asked to assess Steed's ability to understand, remember and carry out instructions, Dr. Lyall stated "[h]er focus and attention skills *may* be somewhat bothered by her depressive symptoms and health problems."  (Tr. 572) (emphasis added).  When asked to assess Steed's ability to maintain attention and concentration, to maintain persistence and pace, and to perform simple or multi-step tasks, Dr. Lyall again stated Steed "*may* have some focus and attention problems," because of her depression and physical problems.  (*Id*.) (emphasis added).  When asked to assess Steed's ability to respond appropriately to supervision and to coworkers in a work setting, Dr. Lyall merely noted that Steed had gotten along well with others over the years, had a friend with whom she maintained regular contact, but generally avoids others due to her depression.  (Tr. 572-573).  Finally, Dr. Lyall observed that Steed "would have difficulty dealing with work pressure at the present time," but did not elaborate whether he believed that level of difficulty was severe, moderate, or otherwise explain how that difficulty would translate into a specific work-related limitation.  (Tr. 573).  Steed cites no authority suggesting that an ALJ errs by rejecting a medical source's non-committal statement that limitations may or may not be applicable.  Because it is unascertainable whether Dr. Steed's qualified statements are more or less restrictive than the RFC, the Court cannot find that the ALJ erred by construing them as less restrictive than the RFC.

Steed does suggest that Dr. Lyall's statement that she would have difficulty dealing with work pressure, coupled with Dr. Lyall's assessment of a GAF score of 50, "would appear to be incompatible with a finding of employability."  (Doc. 11 at p. 13).  This, however, is Steed's own interpretation of the record, which the ALJ was not bound to accept.  In fact, the ALJ specifically

found that the GAF scores of record were too few and too varied to be given much credit.

> The claimant has been assigned few global assessment of function scores, even taking into account the abbreviated record of treatment.  The scarcity of issuance of these scores renders them of dubious value as an analytical tool.  Nevertheless, it is noted that although the claimant has been issued a range of scores, from a low of forty-seven (B14F/10), indicative of serious difficulties of social or occupational function to a high of fifty-five (B28F/4), indicative of no more than moderate difficulties of social or occupational function, she has most consistently been issued scores indicative of moderate difficulty of social or occupational function (B22F/12), (B28F/4).

(Tr. 54).

As stated above, the GAF scale was eliminated from DSM-V because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." DSM-V at 16. Furthermore, "the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." *Lee v. Comm'r of Soc. Sec.*, 529 Fed. App'x 706, 716 (6th Cir. 2013) (*quoting DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x 411 (6th Cir. 2006)); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 511 (6th Cir. 2006) ("we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF store in the first place."); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate.")

Here, the ALJ noted the various GAF scores of record, and plainly did not ascribe any

significance to the isolated score assessed by Dr. Lyall.[8]  While Steed would like the Court to construe Dr. Lyall's equivocal statements and GAF assessments as work-preclusive limitations that, she believes, the ALJ improperly rejected, her interpretation of Dr. Lyall's assessment is not the only reasonable interpretation of the record, nor is it a particularly persuasive interpretation. More to the point, Steed has not identified any legal error stemming from the ALJ's consideration of Dr. Lyall's opinions.

### VII.  Conclusion

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision is AFFIRMED.

IT IS SO ORDERED.

/s/ Kenneth S. McHargh
U.S. Magistrate Judge

Date: August 25, 2016

---

[8]  It bears noting that in the same assessment, Dr. Lyall noted Steed had a functional GAF score of 65, which is significantly higher and indicative of only mild symptoms.  (Tr. 572).